**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YONAS FIKRE,
*Plaintiff-Appellant*,

v.

FEDERAL BUREAU OF
INVESTIGATION; JEFFERSON
SESSIONS, Attorney General;
MIKE POMPEO, Secretary of State;
CHRISTOPHER A. WRAY, Director
of the FBI (sued in his official
capacity); CHARLES H. KABLE,
IV, Director of FBI Terrorism
Screening Center (sued in his
official capacity); DANIEL COATS,
Director of National Intelligence
(sued in his official capacity);
PAUL NAKASONE, Director of the
National Security Agency (sued
in his official capacity); DAVID
NOORDELOOS, an FBI Agent
(sued in his official and individual
capacity); JASON DUNDAS, an FBI
Agent (sued in his individual
capacity); NATIONAL SECURITY
AGENCY; UNITED STATES OF
AMERICA,
*Defendants-Appellees*.

No. 16-36072

D.C. No.
3:13-cv-00899-BR

OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted May 9, 2018
Portland, Oregon

Filed September 20, 2018

Before:  Johnnie B. Rawlinson, Milan D. Smith, Jr.,[*]
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

---

## SUMMARY[**]

### Due Process

The panel reversed the district court's dismissal, as moot, of a plaintiff's action alleging that the Federal Bureau of Investigation violated his substantive and procedural due process rights by placing and maintaining him on the No Fly List.

---

[*] Following Judge Garbis's retirement, Judge Smith was drawn by lot to replace him.  Ninth Circuit General Order 3.2.h. Judge Smith has read the briefs, reviewed the record, and listened to oral argument.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that the government's announcement that it was removing plaintiff from the No Fly List did not render his due process claims moot. The panel held that the record suggested that plaintiff's removal from the No Fly List was more likely an exercise of discretion than a decision arising from a broad change in agency policy or procedure. The panel further held that the government had not assured plaintiff that he would not be banned from flying for the same reasons that prompted the government to add him to the list in the first place, nor had it verified the implementation of procedural safeguards conditioning its ability to revise plaintiff's status on the receipt of new information. Finally, the panel held that plaintiff's removal from the No Fly List did not completely eradicate the effects of the alleged violation.

The panel remanded for further proceedings. The panel affirmed the dismissal of plaintiff's Fourth Amendment claims in a concurrently field memorandum disposition.

## COUNSEL

Brandon B. Mayfield (argued), Beaverton, Oregon; Gadeir Abbas and Lena Masri, Council on American-Islamic Relations, Washington, D.C.; Thomas H. Nelson, Zigzag, Oregon; for Plaintiff-Appellant.

Joshua Paul Waldman (argued) and Sharon Swingle, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

## OPINION

CHRISTEN, Circuit Judge:

Yonas Fikre sued the United States government, alleging that the Federal Bureau of Investigations violated his substantive and procedural due process rights by placing and maintaining him on the No Fly List. While the suit was pending, the Defendants removed Fikre from the list and the district court dismissed Fikre's due process claims as moot. Fikre appeals. We have jurisdiction, 28 U.S.C. § 1291, and we reverse.

## BACKGROUND[1]

Fikre is an American citizen who, until 2009, lived in Portland, Oregon and worked for a cellular telephone company. In late 2009, Fikre traveled to Sudan to establish a consumer electronics business in East Africa. In April 2010, while still in Sudan, Fikre was approached by two FBI agents who questioned him about his association with the as-Saber Mosque in Portland and his commercial finances. The agents told Fikre that he had been placed on the No Fly List, which identifies individuals who are prohibited from flying into, out of, or over the United States and Canadian airspace by commercial airlines. The FBI agents offered to remove Fikre from the list if he became a government informant. Fikre refused.

---

[1] At this stage of the proceedings, "[w]e accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

Fikre's business took him to the United Arab Emirates (UAE) in September 2010. As recounted by Fikre, Emirati secret police seized him from the place where he was staying in June 2011 and transported him to an unknown location where he was imprisoned and tortured for 106 days. During this time, Fikre was interrogated about his connection to the as-Saber Mosque and the nature of his financial dealings. One of the interrogators told Fikre that the FBI had requested his detention. Fikre was released in September 2011, but he was unable to board a plane bound for the United States because he remained on the No Fly List. Fikre sought refuge in Sweden. While there, he consulted an attorney and held a press conference denouncing his capture and confinement in the UAE.

The Department of Homeland Security (DHS)'s Traveler Redress Inquiry Program (TRIP) allows individuals the opportunity to have the Transportation Security Administration review and, if appropriate, correct their files if it determines that a person has been erroneously placed on a watchlist. As initially implemented in 2007, the government responded to TRIP inquiries without confirming a traveler's inclusion on the No Fly List. Fikre attempted in November 2013 to rectify his situation through TRIP, but the DHS neither confirmed nor denied his placement on the No Fly List in response to this first inquiry; it stated only that "no changes or corrections [we]re warranted at th[at] time."

In 2015, the DHS modified TRIP to comply with the judgment in *Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014). The revised TRIP protocol includes additional procedural safeguards that were unavailable at the time Fikre filed his action. Requesters are now apprised of their presence or absence on the No Fly List and the unclassified

reasons for their status. Applying the revised procedures, in February 2015 the DHS informed Fikre that he was and would remain on the No Fly List because he had been "identified as an individual who may be a threat to civil aviation or national security." No other reasons were provided for the decision to maintain Fikre on the No Fly List. Fikre was ultimately denied asylum in Sweden, and the Swedish government returned him to the United States in 2015. Fikre avers that these events damaged his reputation by stigmatizing him as a suspected terrorist and so strained his marriage that his wife divorced him while he was stranded outside of the country.

Fikre brought the instant suit against the government raising a variety of common law, statutory, and constitutional claims.[2] As relevant here, Fikre alleged that the FBI violated his right to substantive due process by depriving him of his liberty interest in his reputation and international travel,[3] and by conditioning his removal from the No Fly List upon his agreement to become a government informant. Fikre's complaint also maintained that the FBI denied him procedural due process by placing and keeping him on the No Fly List without adequate notice and an opportunity to be heard. Fikre prayed for injunctive and declaratory relief for both due process claims and asked, among other things, for a

---

[2] Fikre's complaint listed sixteen causes of action, but only his substantive due process, procedural due process, and Fourth Amendment claims are implicated in this appeal. We affirm the dismissal of Fikre's Fourth Amendment claims in a concurrently filed memorandum disposition.

[3] The Supreme Court has recognized the right to international travel as a protected right under substantive due process. *Kent v. Dulles*, 357 U.S. 116, 125 (1958).

declaration by the government that he should not have been added to the No Fly List.

The Defendants moved to dismiss the operative complaint and, shortly thereafter, notified Fikre that he had been removed from the No Fly List. In a joint status report filed at the district court's direction, Fikre agreed that, to the extent he sought an injunction requiring the Defendants to remove him from the list, that claim was moot. Fikre contended, however, that he remained entitled to other injunctive and declaratory relief.

The district court subsequently dismissed Fikre's remaining procedural and substantive due process claims in a detailed decision. The court reasoned that the government's removal of Fikre from the No Fly List was "a sufficiently definite action" to render his claims moot. In reaching this conclusion, the district court observed that the Defendants had publicly stated that Fikre was no longer on the No Fly List, that more than six months had elapsed since this change in status, and that the record did not indicate a lack of good faith on the government's part. The district court also "emphasize[d]" that "the courthouse doors will be open to [Fikre]" were he to be reinstated to the No Fly List in the future.

## STANDARD OF REVIEW

We review "questions of Article III justiciability, including mootness" de novo. *Bell v. City of Boise*, 709 F.3d 890, 896 (9th Cir. 2013) (citing *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011)).

## DISCUSSION

The government argues that Fikre's procedural and substantive due process claims are moot because he has been removed from the No Fly List. In the government's view, insofar as Fikre sought to be removed from the No Fly List, that outcome has now been achieved and his former status does not impinge on his existing legal rights. The government argues that there is no longer a live controversy and no effectual relief the court could grant.

Fikre begs to differ. According to him, the voluntary cessation doctrine should apply to preclude a finding of mootness, especially because the government has not explained why it added him to the No Fly List in the first place and why, years later, it spontaneously took him off of it. Fikre urges that nothing prevents the government from putting him back on the list and that his claims are therefore not moot.

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Id.* at 91 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). It is well-established, however, that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case" unless "it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur" and "interim relief or events have completely and irrevocably eradicated the effects

of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (alteration in original) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33 (1953)); *see Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017). A party asserting mootness has "the 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (alteration in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)). Where that party is the government we presume that it acts in good faith, *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010), though the government must still demonstrate that the change in its behavior is "entrenched" or "permanent." *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015) (quoting *Bell*, 709 F.3d at 900); *see Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014).

Our precedents illuminate the contours of such an inquiry. First, the form the governmental action takes is critical and, sometimes, dispositive. "A statutory change . . . is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed." *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994); *see Chem. Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 877–78 (9th Cir. 2006). The rigors of the legislative process "bespeak . . . finality and not . . . for-the-moment, opportunistic tentativeness." *Libertarian Party of Ark. v. Martin*, 876 F.3d 948, 951 (8th Cir. 2017). On the other hand, "an executive action that is not governed by any clear or codified procedures cannot moot a claim." *McCormack*, 788 F.3d at 1025; *see Trinity Lutheran Church*, 137 S. Ct. at 2019 n.1 (holding that although the state had

"beg[u]n allowing religious organizations to compete for and receive [government] grants on the same terms as secular organizations," it did not meet the requisite "'heavy burden' of making 'absolutely clear' that it could not revert to its policy of excluding religious organizations" (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189)). For cases that lie between these extremes, we ask whether the government's new position "could be easily abandoned or altered in the future." *Rosebrock*, 745 F.3d at 972 (quoting *Bell*, 709 F.3d at 901).

We have also examined the avowed rationale for governmental action when assessing the merits of a claim of voluntary cessation. For instance, *Olagues v. Russoniello*, 770 F.2d 791 (9th Cir. 1985), held that abandonment of a federal investigation into illegal voter registration by non-citizens did not moot the plaintiffs' suit. *Id.* at 794. Important to our conclusion was the fact that "the United States Attorney did not voluntarily cease the challenged activity because he felt that the investigation was improper." *Id.* at 795. "Rather, [he] terminated the investigation solely because it failed to produce evidence supporting any further investigative activities" and "ha[d] at all times continued to argue vigorously that his actions were lawful." *Id.*; *see also Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998) (the discontinuance of syphilis tests on employees "merely for reasons of 'cost-effectiveness'" did not moot the case because the laboratory did not "offer[] any reason why they might not return in the future to their original views on the utility of mandatory testing" and therefore did not rule out that testing might be employed again); *Porter v. Bowen*, 496 F.3d 1009, 1016–17 (9th Cir. 2007) (letter from California Secretary of State to the California legislature tolerating the operation of vote-

swapping websites pending clarification of state election code did not moot lawsuit because "the Secretary has maintained throughout the nearly seven years of litigation . . . that [her predecessor] had the authority under state law to threaten [plaintiffs] with prosecution"); *Forest Guardians v. Johanns*, 450 F.3d 455, 460, 462 (9th Cir. 2006) (Forest Service's practice of not monitoring utilization levels of grazed allotment likely to persist despite interim monitoring because the agency "argued throughout th[e] litigation that it is not required to meet [those monitoring requirements]").

In contrast, *White v. Lee*, 227 F.3d 1214, 1242–44 (9th Cir. 2000) held that a change in administrative policy that embraced plaintiffs' free speech arguments rendered their claims moot. The plaintiffs in *White* opposed the conversion of a motel into a multi-family housing unit for the homeless, *id.* at 1220, by "wr[iting] to the Berkeley City Council, sp[eaking] out before the Zoning Adjustment Board and at other public meetings, and publish[ing] a newsletter with articles critical of the project." *Id.* at 1221. They aired their grievances to the press, asked the business community to espouse their cause, and challenged the integrity of the Zoning Adjustment Board's decision-making processes. *Id.* After the Department of Housing and Urban Development (HUD) investigated the plaintiffs for engaging in a discriminatory housing practice under the Fair Housing Act (FHA), the plaintiffs sued the agency for injunctive and declaratory relief. *Id.* at 1222–25. The investigation prompted HUD to promulgate guidelines prohibiting the investigation of petitioning or lobbying activities that did not threaten physical harm. *Id.* at 1242–43. We held that plaintiff's claim was moot in light of HUD's new guidelines. *Id*. at 1243–44. HUD's change of heart did not fall within the voluntary cessation exception to mootness because it

"represent[ed] a permanent change in the way HUD conduct[ed] FHA investigations," was "broad in scope and unequivocal in tone," and, significantly, "fully supportive of First Amendment Rights." *Id.*

Our case law teaches that a voluntary change in official stance or behavior moots an action only when it is "absolutely clear" to the court, considering the "procedural safeguards" insulating the new state of affairs from arbitrary reversal and the government's rationale for its changed practice(s), that the activity complained of will not reoccur. *McCormack*, 788 F.3d at 1025; *Rosebrock*, 745 F.3d at 974. No bright-line rule separates cases comprehended by the voluntary cessation doctrine from those that are not, but the government's unambiguous renunciation of its past actions can compensate for the ease with which it may relapse into them. In *White*, for instance, we deemed a memorandum issued by an assistant secretary for the Office of Fair Housing and Equal Opportunity sufficient to moot a case, even though there had been no intervening statutory or regulatory change, because the memorandum "addresse[d] all of the objectionable measures that HUD officials took against the plaintiffs . . . and even confesse[d] that th[e] case was the catalyst for the agency's adoption of the new policy." 227 F.3d at 1243. Though there is no bright-line rule for application of the voluntary cessation doctrine, this much is apparent: a claim is not moot if the government remains practically and legally "free to return to [its] old ways" despite abandoning them in the ongoing litigation. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953).

Returning to Fikre's appeal, the government insists that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Already*, 568 U.S. at 91

(quoting *Friends of the Earth, Inc.*, 528 U.S. at 190), because it filed a notice in district court announcing Fikre's removal from the No Fly List. We disagree. Even accepting the government's argument that its notice constitutes a "formal agency action, publicly made, and unequivocally expressed," the mere announcement that Fikre was removed from the list falls short of meeting the government's burden.[4]

To begin, the FBI's decision to restore Fikre's flying privileges is an individualized determination untethered to any explanation or change in policy, much less an abiding change in policy. *Cf. Am. Cargo Transp.*, 625 F.3d at 1180. The DHS re-evaluated Fikre's presence on the No Fly List in 2013 and 2015 pursuant to its TRIP procedure and determined that no adjustments to his status were necessary. Indeed, the DHS affirmed as late as March 2015—*after* it had amended TRIP to conform to the decision in *Latif*—that Fikre posed "a threat to civil aviation or national security" and it refused to remove him from the No Fly List. Yet it did just that fourteen months later, without explanation or any announced change in policy. Fikre was taken off the list two months after briefing was completed on the government's motion to dismiss Fikre's lawsuit. *See* Reply to Motion to Dismiss, *Fikre v. FBI*, No. 3:13-cv-00899-BR (D. Or. Oct. 24, 2016), Dkt. # 96. This record suggests that Fikre's removal from the No Fly List was more likely an exercise of

---

[4] We note that the focus should not be on the absence of evidence that the government intends to reinstate Fikre to the list, as that would improperly shift the evidentiary burden to Fikre to prove the alleged violation will not reoccur. *See Nat. Res. Def. Council v. County of Los Angeles*, 840 F.3d 1098, 1104 (9th Cir. 2016). The government bears the burden of proving mootness. *Id.*

discretion than a decision arising from a broad change in agency policy or procedure.

Moreover, the government has not assured Fikre that he will not be banned from flying for the same reasons that prompted the government to add him to the list in the first place, nor has it verified the implementation of procedural safeguards conditioning its ability to revise Fikre's status on the receipt of new information. As far as we can tell, the current permission Fikre has to travel by air is "discretionary," and not "entrenched" or "permanent." *McCormack*, 788 F.3d at 1025. We presume the government acts in good faith and do not impute to it a strategic motive to moot Fikre's suit, *see Am. Cargo Transp.*, 625 F.3d at 1180, but with no explanation of the reasons for dropping Fikre from the No Fly List, we may not infer the government's acquiescence to the righteousness of Fikre's contentions. On this record, the government has not repudiated the decision to add Fikre to the No Fly List and maintain him there for approximately five years.

Finally, in response to the government's assertion that no relief is available for Fikre's claims, we note that Fikre's removal from the No Fly List does not "completely and irrevocably eradicate[] the effects of the alleged violation[s]." *Davis*, 440 U.S. at 631. The notice filed by the government averred only that "counsel recently was advised by the Terrorist Screening Center that [Fikre] has been removed from the No Fly List." Absent an acknowledgment by the government that its investigation revealed Fikre did not belong on the list, and that he will not be returned to the list based on the currently available evidence, Fikre remains, in his own words, "stigmatiz[ed] . . . as a known or suspected terrorist and as an individual who represents a threat of

engaging in or conducting a violent act of terrorism and who is operationally capable of doing so." Because acquaintances, business associates, and perhaps even family members are likely to persist in shunning or avoiding him despite his renewed ability to travel, it is plain that vindication in this action would have actual and palpable consequences for Fikre.

The government suggests in its appellate brief that if Fikre is ever put back on the No Fly List, that determination would "necessarily be . . . predicated on a new and different factual record," but the government has not executed a declaration to that effect. *Cf. Mokdad v. Sessions*, 876 F.3d 167, 169 (6th Cir. 2017). Nor has the government explained why such a declaration would not constitute additional relief that may be afforded to Fikre. When examining whether a claim has become moot, "[t]he question is not whether the precise relief sought at the time [the case] was filed is still available. The question is whether there can be any effective relief." *McCormack*, 788 F.3d at 1024 (second alteration in original) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006)).

Because there are neither procedural hurdles to reinstating Fikre on the No Fly List based solely on facts already known, nor any renouncement by the government of its prerogative and authority to do so, the voluntary cessation doctrine applies. Fikre's due process claims are not moot.

## CONCLUSION

We reverse the district court's dismissal of Fikre's due process claims and remand for further proceedings.

**REVERSED and REMANDED.**