**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| AMERICAN DIABETES ASSOCIATION, *Plaintiff-Appellant*, | No. 18-15242 |
|  | D.C. No. 5:16-cv-04051-LHK |
| v. | |
| UNITED STATES DEPARTMENT OF THE ARMY; RYAN D. MCCARTHY, Secretary of the Army, in his official capacity; UNITED STATES ARMY FAMILY AND MORALE, WELFARE AND RECREATION PROGRAMS; UNITED STATES ARMY CHILD, YOUTH AND SCHOOL SERVICES, *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted August 5, 2019
San Francisco, California

Filed September 18, 2019

Before:  Eugene E. Siler,[*] Michael Daly Hawkins,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Hawkins

## SUMMARY[**]

### Mootness / Standing

The panel affirmed the district court's Fed. R. Civ. P. 12(b)(1) dismissal of the American Diabetes Association's First Amended Complaint seeking injunctive and declaratory relief under Section 504 of the Rehabilitation Act concerning defendants' provision of diabetes-related care in the U.S. Army's Child, Youth, and School Services' ("CYSS") programs.

The Association is a nationwide non-profit that has assisted families that have assertedly experienced diabetes-related discrimination in the CYSS programs.  CYSS operates programs that are sometimes the only childcare options for families working and living on Army bases in remote areas.

In July 2016, when the lawsuit began, the Army had in place U.S. Army Regulation 608-10 and 2008 Family and Morale, Welfare and Recreation Command Memorandum

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

(the "Old Policy") which prohibited CYSS staff from providing essential medical care for diabetic children. In June 2017, defendants revoked the Old Policy and replaced it with a "New Policy" that provides for possible diabetes-related accommodations.

The panel held that the Association's challenge to the Old Policy, as well as the injuries incurred thereunder, were moot where the Association sought only prospective relief. Specifically, the panel held that defendants satisfied their burden of clearly showing they cannot reasonably be expected to reinstitute the Old Policy's blanket prohibition on care. The panel rejected the Association's contention that the voluntary cessation exception to mootness applied.

The panel held that the Association lacked standing to challenge the New Policy. Specifically, first, the panel held that the district court did not err by finding the Association failed to establish organizational standing where the Association did not show it diverted resources to combat the New Policy, and thereby, did not establish "injury in fact." Second, the panel held that the Association failed to establish representational standing where none of its members had standing to sue in their own right. The panel held that none of the members had actual knowledge of the challenged provisions at the time the operative complaint was filed, and therefore, they would not have been deterred from enrolling their otherwise eligible diabetic children as a result.

## COUNSEL

Stuart Seaborn (argued), Rebecca Williford, Jessica Agatstein, and Freya Pitts, Disability Rights Advocates, Berkeley, California, for Plaintiff-Appellant.

Edward Himmelfarb (argued) and Marleigh D. Dover, Appellate Staff; Alex G. Tse, Acting United States Attorney; Hashim M. Mooppan, Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Michael A. Greene, Richardson Wright LLP, Portland, Oregon; Gregory G. Paul, Morgan & Paul PLLC, Pittsburgh, Pennsylvania; John W. Griffin, Marek Griffin & Knaupp, Victoria, Texas; for Amicus Curiae Pediatric Diabetes Community.

Jocelyn Larkin, Lindsay Nako, and Daniel Nesbit, Impact Fund, Berkeley, California, for Amici Curiae Impact Fund, AARP, AARP Foundation, Animal Legal Defense Fund, Bay Area Legal Aid, Civil Rights Education and Enforcement Center, Law Foundation of Silicon Valley, Legal Aid Association of California, Legal Aid at Work, Legal Aid Foundation of Los Angeles, Legal Services for Prisoners with Children, National Women's Law Center, Public Interest Law Project, Southern Poverty Law Center, and Worksafe Inc.

Todd R. Geremia, Jones Day, New York, New York; Eli M. Temkin, Jones Day, Minneapolis, Minnesota; for Amici Curiae Disability Rights Organizations.

**OPINION**

HAWKINS, Circuit Judge:

**BACKGROUND**

The American Diabetes Association (the "Association") is a nationwide nonprofit with a mission "to prevent and cure diabetes and to improve the lives of those affected by diabetes." In furtherance of its mission, the Association, *inter alia*, "conduct[s] advocacy for laws, regulations, and policies that keep children with diabetes safe at school; . . . [and] provid[es] legal information and assistance to individuals and families experiencing diabetes-related discrimination." Over the past decade, the Association has assisted families that have assertedly experienced diabetes-related discrimination in the Army's Child, Youth, and School Services' ("CYSS") programs. CYSS operates programs such as daycare, after-school care, and summer camps for children and youth on military bases (among others). These programs are sometimes the only childcare options for families working and living on bases in remote areas.

## I.  The Old Policy

In July 2016, when this lawsuit began, the Army had in place United States Army Regulation 608-10 and a 2008 Family and Morale, Welfare and Recreation Command Memorandum (collectively, "Old Policy"), which together prohibited CYSS staff from providing essential medical care for diabetic children. This version of Regulation 608-10 included a statement that:

> [CYSS staff] will not perform functions that
> require  extensive  medical  knowledge  (e.g.,

> determining the dosage or frequency of a prescribed medication); are considered medical intervention therapy (e.g., those not typically taught to parents by physical, occupational, speech therapists or special educators as part of a home program); or if improperly performed, have a high medical risk (e.g., injection of insulin).

The 2008 memorandum stated that staff therefore were not authorized to "[c]ount carbohydrates," "[g]ive injections of insulin to include manipulation of the insulin pump which is an alternate method of delivering insulin," or "[g]ive injections of Glucagon, a rescue medication." Although the Army sometimes granted exceptions to the Old Policy, there was no formal process for seeking or considering exceptions.

## II. The New Policy

In June 2017, after plaintiffs filed their initial complaint, defendants revoked the Old Policy and replaced it with three documents: (1) a revised Regulation 608-10; (2) an Army memorandum titled "Diabetes-Related Accommodations in Child, Youth, and School Services Programs" ("Diabetes Memorandum"); and (3) an Army memorandum titled "Accommodation of Children and Youth with Diabetes in Army Child, Youth, and School Services Programs" ("Accommodation Memorandum") (collectively, "New Policy"). The amended Regulation 608-10 states that all "requests for accommodation must be reviewed and assessed individually" and that CYSS programs "must provide special needs accommodations unless the requested accommodation imposes an undue hardship on the Army, fundamentally alters the [CYSS] program in which the

accommodation is being made, or poses a direct threat to staff or other participants in the program."

The Diabetes Memorandum, *inter alia*, "rescind[s] in [its] entirety" the 2008 memorandum, declares that staff may provide accommodations such as counting carbohydrates and administering glucagon, and provides that only the Army's Assistant Chief of Staff for Installation Management ("ACSIM") may deny an accommodation request.

The Accommodation Memorandum identifies counting carbohydrates and administering insulin and rescue medication as "[r]easonable accommodations" and sets forth a multi-step process through which accommodation requests will be considered. Thereunder, requests that do not (1) require CYSS staff "to determine the correct insulin dosage or to administer insulin," or (2) meet a set of narrow circumstances, such as imposing "an undue hardship" on the Army, must be approved by the installation's CYSS Coordinator and implemented within ten weeks. However, if the CYSS Coordinator's recommendation is to deny the request or the request requires CYSS staff "to determine the correct insulin dosage or to administer insulin," the matter must be submitted to the Garrison Commander, who must either approve the request or make a recommendation to the ACSIM. Thus, it can take up to four months for insulin accommodations to be fully approved and implemented.

## III.    Procedural Background

The Association filed its initial complaint in 2016, seeking injunctive and declaratory relief for violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Specifically, the Association challenged defendants' "blanket policy prohibiting the provision of critical diabetes-related care." On July 21, 2017, around six weeks after

defendants instituted the New Policy, the Association filed the operative amended complaint ("FAC"). Therein, the Association, again seeking only prospective relief, alleges the New Policy violates Section 504 of the Rehabilitation Act by creating an impermissibly "burdensome accommodation review process."

Defendants moved to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(1), arguing the Association's claims against the Old Policy were moot and the Association lacks standing to challenge the New Policy. The court granted the motion and dismissed the FAC with leave to amend. Thereafter, the Association filed notice of its intent to stand on its pleading, and the court entered a final Judgment of Dismissal. This timely appeal followed.

## STANDARD OF REVIEW

We review de novo a dismissal for mootness and lack of Article III standing. *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1151 (9th Cir. 2017). Where, as here, a defendant brings a factual jurisdictional attack under Rule 12(b)(1), the "court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.* (quoting *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)).

## DISCUSSION

The Association contends the district court erred by concluding the injuries the Association suffered under the Old Policy are moot and that the Association lacks standing to challenge the New Policy.  We address each argument in turn.

### I.  Mootness

The Association contends its injuries under the Old Policy are not moot because: (1) the New Policy continues to violate the Rehabilitation Act; and (2) the voluntary cessation doctrine applies.

### a.  Repeal and Replacement as Settling the Controversy Regarding the Old Policy

"A case becomes moot . . . 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'"  *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 89 (2013)).  Where the challenged conduct "has been 'sufficiently altered so as to present a substantially different controversy . . . [,] there is 'no basis for concluding that the challenged conduct [is] being repeated.'"  *Chem. Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 875 (9th Cir. 2006) (third alteration in original) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993)).  The Association, citing *Northeastern Florida*, argues the New Policy continues to discriminate against persons with diabetes and thus does not moot the Association's claims under the Old Policy.  There, however, the new city ordinance continued the challenged practice "by another

name" and thus "disadvantage[d] [the plaintiff] in the same fundamental way." 508 U.S. at 662.

Here, by contrast, the Association alleges the Old Policy harmed it by placing a blanket prohibition on care, whereas the New Policy allegedly harms the Association by instituting a burdensome approval process. As it is undisputed that the New Policy repealed the blanket prohibition and specifically lists the subject accommodations as reasonable, the policy "has been 'sufficiently altered so as to present a substantially different controversy.'" *Helliker*, 463 F.3d at 875 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 662 n.3); *see Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 901 (9th Cir. 2007) (holding claims for injunctive and declaratory relief moot where "the constitutional deficiencies . . . alleged in connection with the original sign ordinance" had been cured).

### b. Voluntary Cessation

The Association also argues the voluntary cessation exception to mootness applies. Thereunder, "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Rosebrock*, 745 F.3d at 971 (quoting *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 306 (2012)). Thus, although courts "presume that a government entity is acting in good faith when it changes its policy, . . . when the Government asserts mootness based on such a change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again." *Id.* (citation omitted). It may do so by persuading the court that "the change in its behavior is 'entrenched' or 'permanent.'" *Fikre v. FBI*, 904 F.3d 1033,

1037 (9th Cir. 2018) (quoting *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015)).[1]

The Association contends the district court erred by finding the government automatically satisfied its burden by amending Regulation 608-10.  According to the Association, the court should have applied the framework outlined in *Rosebrock*, which expressly applies to policy changes "not reflected in statutory changes or even in changes in ordinances or regulations."  745 F.3d at 963.  This is so, the Association argues, because, while the regulatory amendment "deleted the prohibition on insulin accommodations," "all substantive provisions appear in [the] policy memoranda that could be changed at any time."

Even assuming *Rosebrock*'s "loose framework" of non-exhaustive considerations is applicable here, defendants have shown the conduct the Association challenged under the Old Policy—the blanket refusal to provide diabetes-related care—cannot reasonably be expected to recur.

First, "the policy change is evidenced by language that is 'broad in scope and unequivocal in tone.'"  *Rosebrock*, 745 F.3d at 972 (quoting *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000)).  The New Policy unequivocally renounces the previously challenged prohibition on care and Regulation 608-10 now provides that CYSS "must provide special needs accommodations" unless a set of narrow circumstances, such as "undue hardship," are present.

---

[1] Where, as here, the defendant has voluntarily ceased its challenged conduct, the mootness inquiry bears "on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power."  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

Further, the interpretive memoranda identify diabetic accommodations as reasonable and announce a policy of "promot[ing] the participation and inclusion of children and youth with diabetes in [CYSS] programs and activities."

Second, the New Policy "addresses all of the objectionable measures that [the Government] officials took against the plaintiffs" under the Old Policy.  *Id.* (alteration in original) (quoting *White*, 227 F.3d at 1243).  Although the Association contends the New Policy is infirm for other reasons, the challenged prohibition on care has been repealed.

Third, the Association concedes that this case "was the catalyst for the [government's] adoption of the new policy." *Id.* (quoting *White*, 227 F.3d at 1243).  This weighs in favor of a finding of mootness.  *Id.*

Fourth, the New Policy has been in place for a relatively long time—over two years.  *Cf. id.* at 974 (finding this consideration weighed in favor of a finding of mootness where, at the time the court issued its opinion, the policy had been in place for more than three years).

The fifth consideration, whether, since the New Policy's implementation, defendants "have not engaged in conduct similar to that challenged by the plaintiff," *id.* (quoting *White*, 227 F.3d at 1243), also weighs in favor of a finding of mootness.  The Association relies on declarations from parents who state that, about two months after the New Policy was instituted, certain CYSS staff remained unaware of the change.  However, although the declarations evidence some confusion in CYSS's transition to the New Policy, they show that, rather than continuing to enforce the Old Policy, CYSS subjected new requests to the New Policy's procedures.

Lastly, while a lack of "'procedural safeguards' insulating the new state of affairs from arbitrary reversal" can counsel against mootness, *Fikre*, 904 F.3d at 1039, and defendants have not offered evidence showing what procedures insulate the New Policy, the policy change is enshrined, at least in part, in a regulatory revision, and thus stands in stark contrast to the policy changes this court has found insufficient to render claims moot, *cf. id.* at 1039–40 (FBI's decision to remove plaintiff from the no fly list was "an individualized determination untethered to any explanation or change in policy, much less an abiding change in policy"); *Bell v. City of Boise*, 709 F.3d 890, 900–01 (9th Cir. 2013) (where, *inter alia*, "the authority to establish policy for the Boise Police Department is vested entirely in the Chief of Police," that official's unilateral "Special Order" did not moot case).

Under these circumstances, defendants have satisfied their burden of clearly showing they cannot reasonably be expected to reinstitute the Old Policy's blanket ban. Thus, as the Association seeks only prospective relief, its challenge to that policy, as well as the injuries incurred thereunder, are moot.

## II.  The Association's Standing to Challenge the New Policy

The Association contends that, even absent injuries incurred under the Old Policy, it has standing to challenge the New Policy on its own behalf and on behalf of its members. Either basis would be sufficient to confer standing, *Am. Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979, 983 (9th Cir. 2004), and we address each in turn.

### a.  Organizational Standing

The Association contends it diverted resources to combat the New Policy and thus has standing to sue on its own behalf.  This theory of standing has its roots in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  There, a fair housing organization claimed the defendant's discriminatory housing practices "frustrated" the organization's "ability to provide counseling and referral services for low- and moderate-income homeseekers," and had forced the organization "to devote significant resources to identify and counteract the" alleged discriminatory practices.  *Id.* at 379.  Thus, the organization established a "concrete and demonstrable injury to [its] activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests."  *Id.*

Thus, under *Havens Realty*, an organization may establish "injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [conduct] in question."  *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004).  For example, in *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219 (9th Cir. 2018), *as amended by* 2018 WL 8807133 (9th Cir. December 7, 2018), the plaintiff organizations created "education and outreach initiatives regarding the [challenged] rule."  *Id.* at 1242.  In *National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015), to counteract alleged voter registration violations, civil rights groups "expend[ed] additional resources" that "they would have spent on some other aspect of their organizational purpose."  *Id.* at 1039.  In these cases, the plaintiffs were not "simply going about their 'business as usual,'" *id.* at 1040–41, but had altered their resource

allocation to combat the challenged practices, *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding organizational standing where the plaintiffs "had to divert resources to educational programs to address its members' and volunteers' concerns about the [challenged] law's effect"); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (finding organizational standing where the plaintiff, in response to the defendant's challenged practices, "started new education and outreach campaigns targeted at discriminatory roommate advertising"); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943–44 (9th Cir. 2011) (finding organizational standing where resources directed toward "assisting day laborers during their arrests and meeting with workers about the status of the [challenged] ordinance would have otherwise been expended toward [the advocacy group's] core organizing activities"); *Smith*, 358 F.3d at 1105 (finding organizational standing where complaint was dismissed without leave to amend and plaintiff alleged it "divert[ed] its scarce resources from other efforts" so it could "monitor the [subject] violations and educate the public regarding the discrimination"); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding organizational standing where plaintiff alleged it had expended thousands of dollars to "redress[] the impact" of defendant's discrimination and, as a result, was unable "to undertake other efforts to end unlawful housing practices"); *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (finding organizational standing where plaintiffs "expend[ed] resources in representing clients they otherwise would spend in other ways").

Here, the only resource the Association claims it diverted as a result of the New Policy is the time one of its two staff

attorneys took to handle a single intake call from an Army parent.  The staff attorney "explained the Army's history of policies and practices, the [New] Policy, the famil[y's] rights under federal law, and next steps in advocating for their child."  According to the Association, that call prevented the staff attorney from taking other calls concerning discriminatory practices.

Such evidence shows that, unlike the plaintiffs in *Havens Realty* and our cases applying it, the Association did not divert any resources but was merely going about its business as usual.  Its staff attorneys dedicate a portion of their time to taking calls, and one Army parent used that service.  The Association has not shown that, at the time the operative complaint was filed and as a result of the New Policy, the Association had altered or intended to alter its resource allocation to allow its attorneys to take a higher volume of calls or separately address the New Policy.  *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 655 (9th Cir. 2002) (holding that courts "must consider the facts as they existed at the time that the complaint was filed").  Thus, the court did not err by finding the Association failed to establish organizational standing.[2]

---

[2] Because the Association has failed to show any diversion of resources under *Havens Realty*, the Association's reliance on *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973), for the proposition that the staff attorney's inability to take other calls constitutes an "identifiable trifle" sufficient to confer standing is misplaced.  For the same reason, we need not and do not reach the Association and amici's contentions that the court erred by (1) imposing a quantitative threshold on resource diversion (*i.e.*, requiring the Association show it redirected *enough* resources to "perceptibly impair" its mission); and (2) holding that the resources must be expended outside the organization's usual scope of work.

### b.  Representational Standing

An organization has standing to sue on behalf of its members where: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Here, the interests the Association seeks to protect are germane to its purpose and no claim asserted or relief requested requires the participation of the Association's members.  Thus, we must determine whether any of the Association's members have standing to sue in their own right.

In that regard, the Association contends the New Policy's accommodation procedures have deterred two of its members, Bendlin and Brantly, from enrolling their eligible diabetic children in CYSS programs.[3]   In support of its position, the Association relies on our case law under the Americans with Disabilities Act ("ADA"), wherein we have found standing where plaintiffs have "actual knowledge" of an access barrier and are deterred from accessing the accommodation as a result.  *See Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1099 (9th Cir. 2017)

---

[3] Defendants contend the Association was required to identify in its complaint the members on which it relies and failed to do so.  However, the Association asserted representational standing in the FAC and provided declarations from Bendlin and Brantly in response to defendants' Rule 12(b)(1) motion to dismiss.  That is sufficient.

("It is the plaintiff's 'actual knowledge' of a barrier, rather than the source of that knowledge, that is determinative.").

Defendants contend such ADA cases are inapplicable because where, as here, a plaintiff seeks accommodation in a government program (rather than a public accommodation) the plaintiff must "provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to adjust the neutral policy in question." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 578–79 (2d Cir. 2003); *see also Oxford House-C v. City of St. Louis*, 77 F.3d 249, 253 (8th Cir. 1996) (holding the plaintiff's Fair Housing Act claim unripe where the plaintiff refused to apply for a zoning variance). However, the plaintiffs in those cases refused to seek variances from the challenged practices through the defendant's unchallenged accommodation procedures. *Tsombanidis*, 352 F.3d at 579; *Oxford House-C*, 77 F.3d at 253. Here, the Association seeks to bring a facial challenge to the accommodation procedures themselves. Thus, failure to first seek accommodation thereunder does not render the Association's claims unripe.

Defendants do not argue that our cases analyzing standing in the ADA context are otherwise inapplicable. Indeed, "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act," *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999), and any difference in the statutes' application or standards for relief on the merits is irrelevant to the question of what constitutes an Article III injury, *cf. Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1174 n.3 (9th Cir. 2017) (holding that, despite different applications of Title II (discrimination in public services) and Title III (discrimination in public

accommodations) of the ADA, "the answer to the *constitutional question* of what amounts to injury under Article III is the same"). Thus, if Bendlin or Brantly had actual knowledge of the New Policy's challenged provisions at the time the operative complaint was filed and have been deterred from enrolling their otherwise eligible diabetic children as a result, they, and thus the Association, have standing. *See Scott*, 306 F.3d at 655.[4]

The operative complaint was filed on July 21, 2017. In their declarations, executed August 17, 2017, and August 18, 2017, respectively, Bendlin and Brantly aver that they "recently learned" the Army revised its policy and that the Association provided them with a copy of the revised policy on August 14. Both then state that, having "reviewed [the] revised policy," they take issue with its provisions. Even when viewed in the light most favorable to the Association, such statements are insufficient to show either Bendlin or Brantly had actual knowledge of the challenged provisions at the time the operative complaint was filed. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) ("When the defendant raises a factual attack [under Rule 12(b)(1)], the plaintiff must support her jurisdictional allegations with 'competent proof,' under the same evidentiary standard that governs in the summary judgment context." (citation

---

[4] To the extent the Association contends Brantly suffered an injury separate and apart from being deterred because her child attended a CYSS program from June 12 (the day the New Policy was adopted) to June 30, 2017, and was not afforded insulin accommodations during that period, the Association's reliance thereon is unavailing. As "past wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy" for prospective relief, *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), Brantly's standing rests on whether she has been deterred.

omitted)). Thus, the court did not err by finding the Association failed to establish representational standing.**[5]**

## CONCLUSION

For the reasons set forth above, any challenge to the Old Policy is moot, and the Association lacks standing to challenge the New Policy.

**AFFIRMED.**

---

**[5]** In the facts section of its brief, the Association mentions a third member, Erwin, who avers: "I received a copy of CYSS's revised policy from the Association on August 14. I reviewed it, and I am still not sure if it is worth the trouble in trying to get the accommodations again." Such statements are similarly insufficient to show the declarant had actual knowledge of the challenged provisions on July 21, 2017.